## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN WIDEMAN,                          :
    Petitioner,                    :        CIVIL NO. 3:02CV1422 (AWT)

v.                                     :

JOHN J. ARMSTRONG,                     :        MAY 16, 2005
    Respondent.                            :

## MEMORANDUM OF LAW IN OPPOSITION TO
## APPLICATION FOR A WRIT OF HABEAS CORPUS

The respondent hereby opposes the petitioner's Application for a Writ of Habeas

Corpus filed pursuant to 28 U.S.C. §2254.  In his application, the petitioner claims that the

state convictions that resulted in his imprisonment were obtained in violation of his rights

under the Sixth Amendment to the United States Constitution.  Specifically, the petitioner

claims that the deficient performance of his defense counsel deprived him of his right to

the effective assistance of counsel at his trial.  "Petition by a State Prisoner for a Writ of

Habeas Corpus" at 3.  The petitioner further contends that the Connecticut courts applied

the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) unreasonably in rejecting his claim that his trial

counsel was ineffective in advising him not to testify. "Memorandum in Support of Petition"

(hereinafter "Petitioner's Memorandum") at 12-13.  The petitioner's claim for relief under

§2254 must be denied because the Connecticut courts properly applied well-established

federal law in rejecting his ineffective assistance claim.

## I.    NATURE OF THE CASE

After trial by jury in the Superior Court for the Judicial District of Fairfield, the petitioner

was convicted of kidnaping in the first degree, in violation of General Statutes §53a-92,

sexual assault in the first degree, in violation of General Statutes §53a-70, accessory to sexual assault in the first degree, in violation of General Statutes §§53a-8 and 53a-70, and conspiracy to commit kidnaping in the first degree and sexual assault in the first degree, in violation of General Statues §§53a-48, 53a-92 and 53a-70.  On May 7, 1993, the trial court, *Maiocco, J.*, sentenced the petitioner to imprisonment for twenty years.  The petitioner's convictions were affirmed by the Connecticut Appellate Court on November 22, 1994. State v. Wideman, 36 Conn. App. 190, 650 A.2d 571 (1994), Appendix A.  The petitioner filed a petition for certification to appeal which was denied by the Connecticut Supreme Court on January 10, 1995. State v. Wideman, 232 Conn. 903, 653 A.2d 192 (1995), Appendix B.

The petitioner then filed a petition for a writ of habeas corpus in the Connecticut Superior Court for the Judicial District of Hartford.  On October 3, 2000, after a hearing on the merits of the petitioner's claim, the habeas court, *Rittenband, J.*, denied the relief sought in the state habeas corpus petition. "Memorandum of Decision," Wideman v. Warden, CV96-563147, Appendix C.  The judgment of the habeas court was affirmed by the Connecticut Appellate Court on January 29, 2002. Wideman v. Commissioner of Correction, 67 Conn. App. 739, 789 A.2d 1097 (2002), Appendix D.  The petitioner filed a petition for certification to appeal which was denied by the Connecticut Supreme Court on March 28, 2002. Wideman v. Commissioner of Correction, 260 Conn. 906, 795 A.2d 547 (2002), Appendix E.  The petitioner filed his application for a federal writ of habeas corpus on August 15, 2002.

2

## II.    STATE CRIMINAL AND HABEAS CORPUS PROCEEDINGS

### A.    The Petitioner's Trial

The presentation of evidence in the petitioner's case began on February 3, 1993. At trial, the state called the petitioner's victim, Grace Quiles, as its first witness. Quiles testified that on August 24, 1991, she lived in an apartment in Building 17 at Father Panik Village, a low-income housing project in Bridgeport. At that time, she was living with her boyfriend, Michael Epps. On that evening, Epps had gone out leaving Quiles at home alone. Sometime thereafter, Quiles left the apartment and went down stairs on her way to visit a friend. When she reached the first floor, Quiles was accosted by the petitioner. T. 2/3/93 at 64-64, Appendix F.[1] The petitioner, who did not live in the building, confronted Quiles and demanded to know why she kept locking the gate in the hallway where her apartment was located. Quiles testified that she kept the gate locked so that people would not be able to sell drugs and use drugs in the hall outside her apartment. The petitioner told Quiles that he wanted the gate kept open so that he could sell drugs in the hall. After arguing with the petitioner, Quiles went back upstairs and returned to her apartment. Id., at 66, 69-70.

Fifteen or twenty minutes later, Quiles left her apartment and attempted to go downstairs again. In order to get to the first floor, Quiles had to unlock the gate in the hallway and pass through it. When Quiles opened the gate, the petitioner and several

---

[1]    The daily transcripts of the petitioner's trial were bound into three separately paginated volumes. References to the trial transcript, therefore, are denoted by T. followed by the date on which the testimony to which reference is made was given. Copies of each of the daily transcripts of the trial are are included in the appendices to the respondents' memorandum.

other men entered the hall and began to yell at her.  The men with the petitioner were Kevin Rogers, Reggie Rogers, Nate Rogers, Maurice McNeil, Gene Black and Nicholas Wardlaw.  The petitioner and the others demanded to know why Quiles would not leave the gate open. T. 2/3/93 at 70-71, Appendix F.  Kevin Rogers then began to fondle Quiles. Id., at 73-74.  As he fondled her, Rogers asked Quiles how she thought that she should be punished for keeping the gate locked.  Rogers then gave Quiles the option of being "beaten down" by the members of the group or performing oral sex on all of them.  As Rogers was speaking to Quiles, McNeil took off his belt and began to use it to hit Quiles lightly on her legs.  Quiles said that she did not want to be "beaten down" so Rogers told her that she would have to perform oral sex on the entire group.  The petitioner and the others then walked Quiles out of Building 17 and took her  to Building 13. Id., at 75-77, 95-96.

Quiles testified that she did not run away as the men walked her to the other building because the members of the group walked next to her and right behind her.  She testified that she was afraid that if she tried to run away, the men in the group would catch her and beat her.  She testified that she believed that the men would beat her if she tried to escape because Kevin Rogers had hit her with his belt on a previous occasion.  She had also seen Kevin Rogers hit her boyfriend, Michael Epps, with a belt and set his pit bull loose on him.  T. 2/3/93 at 97, Appendix F.   She testified that she had seen Kevin Rogers, Nate Rogers, Reggie Rogers and Maurice McNeil, acting as a group, viciously beat other people.  She stated that she had seen the group beat people to the ground, kick them in the face and then put the dog on them. Id., at 97-98.

Quiles then testified that she was especially afraid of the petitioner. When the prosecutor asked why, the petitioner's defense counsel, Assistant Public Defender Barry Butler, objected on two grounds. First, Attorney Butler argued that there was no foundation for testimony regarding prior conduct by the petitioner involving Quiles. The trial court overruled the objection. Attorney Butler then objected on the ground that the prosecutor's question called for a hearsay response. T. 2/3/93 at 99-100, Appendix F. The prosecutor responded that the testimony was being offered to show Quiles's state of mind and not for the truth of the matter asserted. The trial court overruled the objection, but before allowing Quiles to answer the question, the court gave the jury the following limiting instruction:

> The court will instruct the jury that the information that's being elicited is not being offered for the truth of it. In other words, you are not obliged to determine whether it is true or not true. It is whether this individual – whether this had any effect on her state of mind as to that information, whether it was true or not. So it's not being offered for the truth of it only for the effect it might have had on her state of mind at the time.

Id., at 100-101.

Quiles then testified that Michael Epps had told her "about a month and a half before the rape that [the petitioner] had did jail time for two bodies and he was out on bond for a double homicide." T. 2/3/93 at 101, Appendix F. The trial court then gave the jury the following additional instruction:

> I would just further caution the jury that that type of evidence cannot be used to determine the defendant's guilt of the crime that he is presently charged with. The fact that he may have had, if you believe that – he did have other involvements – the fact that he may have been involved in another crime or crimes is not proof of the fact that he committed these crimes, but it may be used by you only to determine whether or not, if that knowledge was within the mind of this victim, whether or not it is true or not true, whether that's what she believed and whether it affected her state of mind.

5

Id., at 101-102.  The trial court then recessed for lunch and later adjourned for the day without taking further evidence.  Id., at 102, 105.

When court opened the next day, Attorney Butler immediately moved for a mistrial. Butler argued that the petitioner could no longer receive a fair trial because the jury had been led to believe that he had been involved in four homicides.  Butler argued as follows:

> We are talking about, about four homicides that the jury is now aware of, your honor.  That is very assaultive in nature.  So are the allegations in this case.  In addition to that, it tends to show a propensity toward violence and these are alleged to be violent crimes.  So the jury is no longer looking at this gentleman over here at the table for the defense as someone who is presumed innocent.  People on the jury is [sic] looking across on a man they conclude now is a killer, someone who has been involved in four homicides. Anything he says is going to be viewed by the jury with a grain of salt. Though out the whole trial, they are going to view him as a bad guy, and, frankly his right to a fair trial has, therefore, been greatly impinged upon.

T. 2/4/93 at 3, Appendix G.  Butler continued, as follows:

> Moreover, in this case, it was our plan to wait and see if he was going to testify or not.  The hope was that he would not have to testify.  My client doesn't have the best record I have ever had with a client, Your Honor, and for these reasons we discussed his not testifying, and it's noteworthy that throughout the voir dire I asked each and every juror if he didn't take the stand would you follow the instructions from the court?  It was very important to me because the plan was to not have him take the stand if at all possible. Now, he's faced with no choice at all, he has no choice but to take the stand to explain away the conduct and the two bodies, and the double homicide that he's out on.  This is an individual who cannot get a fair trial.  He's faced with no choice at all.  The fact that he's linked with that case he is damned if he does, if he doesn't he's damned.  They are going to view him as a bad guy, as perhaps a killer, as someone who no longer has the presumption of innocence with this jury.  Now he has to testify.  If he doesn't testify he's just going to be out there.  The jury is going to think that he's not testifying because he has something to hide.  He's not testifying because he must have a bad record.  Look at what we heard already.

Id., at 3-4.

In response to Attorney Butler's motion for a mistrial, the prosecutor argued that the court had properly allowed Quiles to testify regarding her knowledge of the petitioner's previous criminal conduct, that the testimony was essential to establish the state's theory that Quiles accompanied the petitioner and the others to Building 13 and performed oral sex on them because she reasonably feared for her safety if she did not do so, and that the trial court's limiting instruction to the jury prevented any undue prejudice to the petitioner as a result of the testimony. T. 2/4/93 at 7-8, Appendix G. The trial court ruled that the evidence of Quiles's knowledge of the petitioner's previous criminal conduct was more probative than prejudicial and was therefore properly admitted into evidence. The court also ruled that its limiting instructions protected the petitioner from undue prejudice. Accordingly, the trial court denied the petitioner's motion for a mistrial. Id., at 9-11.

Grace Quiles then returned to the witness stand and continued her testimony before the jury. Quiles testified that the petitioner and the other men took her to an apartment on the third floor of Building 13. They told her to go into the bathroom and take a shower and then to come back into the living room naked. T. 2/4/93 at 22-24, Appendix G. The members of the group told Quiles what they intended to have sex with her on a mattress that was on the floor in livingroom of the apartment. Kevin Rogers informed Quiles that half of the group "wanted pussy and head" and half of them "just wanted head." Id., at 36. Kevin Rogers, Nate Rogers, Reggie Rogers and Maurice McNeil said that they wanted Quiles to perform oral sex on them as well as having "regular" or vaginal sex with her. The petitioner, Gene Black and Nicholas Wardlaw said that they only wanted Quiles to perform oral sex on them. Id., at 27, 34-36. When Quiles went into the bathroom to shower, she

attempted to close the door.  When she did so, Nate Rogers told her not to be stupid and ordered her to leave the door open.  Id., at 22-24, 36.

When Quiles came out of the bathroom, an individual named Scott Sheffield had joined the group.  Sheffield took off his pants and lay across the mattress.  Kevin Rogers told Quiles to perform oral sex on Sheffield.  When Quiles put Sheffield's penis in her mouth, he began to giggle.  Kevin Rogers told Sheffield to get up and told Nicholas Wardlaw to "go next."  Kevin Rogers then sent Sheffield out to get condoms. As Quiles was performing oral sex on Wardlaw, Kevin Rogers told his infant son, who was with him in the apartment, to put a piece of ice on Wardlaw's chest.  After the child placed the ice on Wardlaw, Kevin Rogers told Quiles to lick it off. As Quiles was licking the ice off Wardlaw's chest, Nate Rogers approached Quiles from behind and inserted a beer bottle into her vagina.  As Rogers inserted the bottle into Quiles's vagina, the petitioner and the other men were laughing and jeering. T. 2/4/93 at 22-24, 38, Appendix G; T. 5/26/00 at 54, Appendix O.

At this point, Wardlaw faked an orgasm and said that he was through.  Kevin Rogers then told Quiles that she had to "do" Gene Black.  As Quiles was performing oral sex on Black, Maurice McNeil was striking her on her buttocks with his belt.  T. 2/4/93 at 38, 42, Appendix G.  At one point during the incident, Quiles stopped and said that she would not continue to perform oral sex.  When Quiles made this statement, Nate Rogers pushed her and caused her to bump her head on the stereo next to the mattress. Id., at 39.[2]

---

[2] Quiles testified that she could not remember whether she was performing oral sex on Wardlaw or on Black when Nate Rogers pushed her. T. 3/4/93 at 39, Appendix G.

When Black had an orgasm, Kevin Rogers told him to get up and said that it was the petitioner's turn.  The petitioner told Quiles that he wanted her to perform oral sex on him just as well as she had performed it on the others.  When the petitioner put his penis in Quiles's mouth, Michael Epps, Quiles's boyfriend, began banging on the door to the apartment and calling her name.  T. 2/4/93 at 43, Appendix G.  When the petitioner and the others went to the door, Quiles got up, went back to the bathroom and put on her clothes.   A few moments later, the petitioner came into the bathroom and asked her why she had put her clothes on.  The petitioner said "You still have to do me," and ordered Quiles to disrobe again.  Quiles took off her clothes and returned to the livingroom.  The petitioner, who was seated in a chair, told Quiles to kneel in front of him.  When she did so, the petitioner put his penis in her mouth again. Id., at 43-45.

A few minutes later, Quiles heard police radios outside the building and she heard policemen come up the stairs and go to another apartment on the third floor.  When the policemen left a short time later, Kevin Rogers, Nate Rogers, Reggie Rogers and Maurice McNeil left the apartment. T. 2/4/93 at 44-45, Appendix G. At this point, Quiles was still performing oral sex on the petitioner.  She then heard another knock on the door.  When the petitioner got up to answer it, Quiles went back to the bathroom and put her clothes on again, hoping that the distraction would create an opportunity for her to leave.  When the petitioner returned, however, he told Quiles to come out of the bathroom and to continue performing oral sex on him.  Quiles took her clothes off, went back into the livingroom and again began to perform oral sex on the petitioner. Id., at 46-47.

A few minutes later, someone outside the apartment called the petitioner's name. The petitioner left the apartment and Quiles again went to the bathroom and put on her

clothes.  When she returned to the livingroom, Black and Wardlaw were there by themselves.  They told Quiles that Kevin Rogers had wanted the petitioner and that the petitioner had gone downstairs to Rogers's apartment. T. 2/4/93 at 47, Appendix G.  A few minutes later, the petitioner returned to the apartment and began to pick up beer bottles and straighten up the furniture.  Quiles asked the petitioner if she could leave, the petitioner told her that she could leave the apartment when he left.  A few minutes later, the petitioner left the apartment and permitted Quiles to leave as well. Id., at 48.

After leaving the apartment, Quiles went to look for Michael Epps.  Later that evening, she found Epps at Bridgeport Hospital.  When Quiles saw Epps at the hospital, his ribs were bandaged, his face and arms were scrapped, and his pants were torn and bloody.  After Epps was discharged, he and Quiles went back to their apartment in Building 17 at Father Panik Village.  T. 2/4/93 at 51-52, Appendix G.  The next day, Quiles saw Kevin Rogers and several of the other men who had assaulted her standing outside of her building.  Rogers told her not to think that she was finished and that they were going to come back and get her that night.  He also said that they were going to kill Epps because he had called the police the  night before. When Quiles returned to her apartment, Epps called the police. Id., at 70; T. 2/8/93 at 191, Appendix H.  The police took Quiles to the hospital and she described the sexual assaults upon her to the hospital personnel who examined her.  After leaving the hospital, she went to the police station and gave the police a statement regarding her abduction and the sexual assaults to which she was subjected during the abduction. Id., at 87-88.

During his cross-examination of Quiles, Attorney Butler questioned her aggressively in an effort to impeach her credibility.  Under questioning by Butler, Quiles admitted that

she had used drugs for ten years and that she had been a crack cocaine user for four years.  T. 2/8/93 at 133, Appendix H.  She also admitted that she had been a prostitute, that she had lied, that she had stolen and that she had forged checks. Id., at 134, 157-58. Quiles also acknowledged that she had performed oral sex on Kevin Rogers on a previous occasion in exchange for money. Id., at 155-56.  Finally, Quiles testified that she had picked up the petitioner on two occasions while working as a cab driver after the day that she claimed the petitioner and the others assaulted her. Id. at 184-85.

The state also presented the testimony of Michael Epps.  Michael Epps testified that on August 24, 1991, he was living with his girlfriend, Grace Quiles, in an apartment in Building 17 in the Father Panik Village housing project. T. 2/8/93 at 221-22, Appendix H. Epps testified that on that evening he left the apartment to go the store.  On his way to the store, Epps saw the petitioner, whom he had known all his life, standing in front of Building 17. Id., at 223-24.  When he returned to his apartment, later that evening, Quiles was not there.  Epps left the apartment and went to look for her.  After he had asked a number of people if they had seen Quiles, someone told him that she had left the building with a group of men.  Epps believed that the men may have taken her to Building 13.  He went to Building 13 and encountered Scott Sheffield.  Sheffield provided Epps with information that led him to believe that Quiles was in an apartment on the third floor of Building 13.  At the time, Epps believed that it was apartment number 309. Id., at 225-227; T. 5/26/00 at 54, Appendix O.

After Sheffield left, Epps went to the apartment on the third floor where he thought the men may have taken Quiles.  Epps then placed his ear to the door to of the apartment. When he did so, he heard Quiles inside the apartment crying.  He also heard men yelling

11

and laughing and telling Quiles "what she should do and how she should do it."  T. 2/8/93 at 227-28, Appendix H.  Epps attempted to look in window of the apartment, but he was unable to see anything because the shade was down.  Epps then went back to the door to the apartment and began to bang on it.  In response to Epps's banging, Kevin Rogers, whom Epps had also known his entire life, opened the door and threw a bottle at him.  Epps ran out of the building and went to his sister's apartment in Building 9. Id., at 229-30.  Epps testified that he called the police from his sister's apartment and made a complaint about activity that was taking place in apartment 309, Building 13.  Epps did not give his name when he called the police. Id., at 231.[3]

Epps then left his sister's apartment and went out to look for some of his friends.  When Epps was in the vicinity of Building 4, he saw Kevin Rogers, Reggie Rogers and Maurice McNeil coming after him.  Epps tried to run away, but Kevin Rogers and the others caught him and began to beat him.  T. 2/8/93 at 231-32, Appendix H.  Kevin Rogers then said "What's wrong, you don't mind your woman sucking a little dick?" Id., at 236-37.  The three men pulled off Epps's belt and looped it around his neck to so that it would choke him when it was pulled.  They then told Epps that they were going to show him "what she can do" and attempted to drag him back to the apartment where they had Quiles.  Epps resisted the men by grabbing the belt around his neck in order to lessen the choke-hold.  The men gave up trying to drag Epps back to the apartment and instead beat him badly

---

[3] Epps originally testified that he told the police that "someone was being raped" in the apartment. T. 2/8/93 at 230, Appendix H.  Attorney Butler, however, objected to Epps's characterization of actions of the petitioner and his co-conspirators as "rape" on the ground that such a characterization was a "legal conclusion." Id., at 230-31. The trial court sustained the objection and ordered that Epps's original testimony regarding his call to the police be stricken. Id.

at that location.  The three men told Epps that they were beating him because they believed that he had called the police.  After beating him for twenty minutes, Kevin Rogers and the others left Epps lying in the street and departed.  After they left, bystanders came to Epps's assistance and took him to Bridgeport Hospital.  Id., at 237.

At the hospital, police officers questioned Epps about the beating that he had received but he refused to tell them who did it.  Epps did, however, tell the police that he was the individual whom had called earlier to report the incident taking place in Building 13.  Later that evening, Grace Quiles came to the hospital and took Epps back to their apartment in Father Panik Village.  Epps suffered a concussion, bruised ribs, a broken nose and abrasions on his face as a result of the beating he received. T. 2/8/93 at 241-42, 44-45, Appendix H.

The next day, Grace Quiles left their apartment to go to the store.  Epps watched Quiles from the window of the apartment as she left the building.  As Epps watched, he saw Kevin Rogers,  Reggie Rogers and Nate Rogers approach her on the street just below the window.  Epps saw the petitioner standing some distance away behind Quiles, but the petitioner did not approach Quiles and speak to her.  Epps testified that he heard Reggie Rogers ask Quiles where he (Epps) was.  Quiles told him that she did not know.  Kevin Rogers then said "Tell Mike that I'm going to kill him because he thinks he is in love." Kevin Rogers then told Quiles that he was going to pick her up that night "because you didn't do our whole group."  Nate Rogers then took Quiles's sunglasses and she walked away. T. 2/8/93 at 245-46, Appendix H.  After Quiles returned to the apartment, Epps called the police.  Epps went to the hospital  with Quiles while she was treated for the

injuries that she sustained when she was attacked.  After they left the hospital, he went to the police station with her. Id., at 246-47.

The state also presented the testimony of emergency room personnel from Bridgeport Hospital.  Dr. Christopher Boreyko testified that he examined Grace Quiles in the emergency room  on August 25, 1991. T. 2/4/93 at 77-78, Appendix G.  Dr. Boreyko testified that Quiles reported that she had been forced to have oral sex with four men.  She stated that she had been struck in the head, right arm, right thigh and back.  She also reported that a bottle had been introduced into her vagina. When Dr. Boreyko examined Quiles, he found that there was tenderness on the back of her head and on her upper and lower back.  He also observed bruises on her right arm and right thigh. Id., at 81.

The state also called Detective Bruce Belco of the Bridgeport Police Department as a witness.  Belco testified that on August 24, 1991, he was serving as a sergeant in the patrol division.  Belco testified that at 9:35 p.m., he was dispatched to apartment 309, Building 13 in Father Panik Village.  When Belco went to that apartment, he found that it was occupied by two women and several children who knew nothing about the complaint. T. 2/9/93 at 313-15, Appendix I.  Belco testified that the complaint regarding the activity in Building 13 was called in from Building  9. Id., at 318-19.  Belco also testified that he went to the emergency room at Bridgeport Hospital later that night to speak to a man named Michael Epps.  When Belco spoke to him, Epps acknowledged that he was the individual who had called in the complaint regarding an incident in Building 13 earlier that evening.

Epps, however, refused to divulge the identity of the persons who had subsequently assaulted him. Id., at 319.[4]

At the conclusion of the state's case, Attorney Butler made a motion for a judgment of acquittal which was denied by the trial court. T. 2/9/93 at 338-342, Appendix I.  The court then inquired if the defense was going to present a case.  Attorney Butler responded to the court's inquiry as follows:

> My client is deciding whether or not he's going to testify or not testify.  If he does testify, there are pitfalls and we are weighing the decision back and forth.  Your Honor, at this time I've discussed it with my client.  We feel that we are not going to have my client testify.  For all intents and purposes the defense at two o'clock will probably rest.  I would anticipate that closing arguments and charge can happen tomorrow morning if everything goes according to plan.

Id., at 343.  The court then recessed for lunch. Id., at 344.  When the court reconvened, Attorney  Butler made the following statement :

> Your Honor, I had an opportunity to speak to my client once again downstairs and he has concluded it's in his best interests not to take the stand, all things considered, and I agree with that assessment.  At this time, I'm going to rest.

Id.  The court then adjourned for the day. Id., at 345.

The following day, counsel presented their final arguments to the jury.  T. 2/10/93 at 348-390, Appendix J.   The court then instructed the jurors on the law and allowed them

---

[4]  In its case-in-chief, the state also presented the testimony of Barbara Herman, the triage nurse who interviewed Grace Quiles when she arrived at the emergency room on August 25, 1991; T. 2/8/93 at 216-20, Appendix H; Sharon Davis, the social worker who worked in the emergency room; T. 2/9/93 at 302, 304, Appendix I; Detective Judith Tesla, the detective who took the statement from Quiles; T. 2/9/93 at 326-37, Appendix I; and Officer Bohdan Mychhauluk, the evidence officer for the Bridgeport Police Department. T. 2/9/93 at 310-12, Appendix I.

to retire to begin their deliberations. Id., 391-456, 461.[5]  On February 16, 1993, the jury returned verdicts of guilty on all counts. T. 2/16/93 at 476-79, Appendix L.  On May 7, 1993, the trial court sentenced the petitioner to imprisonment for ten years on the charge of kidnaping in the first degree, imprisonment for five years on the charge of conspiracy, and imprisonment for five years on the charge of accessory to sexual assault, each of those terms to be served concurrently, and to imprisonment for ten years on the charge of sexual assault in the first degree, the term to be served consecutively, for a total effective sentence of imprisonment for twenty years. T. 5/7/93 at 31-32, Appendix M.

### B.    The Petitioner's Direct Appeal

The petitioner appealed his convictions to the Connecticut Appellate Court raising four claims of error.  The Appellate Court rejected the petitioner's claims and affirmed the judgement of the trial court.  State v. Wideman, supra, 36 Conn. App. at 206, Appendix A.

The petitioner first claimed that the trial court's denial of his motion in limine and his motion for a mistrial pertaining to Grace Quiles's testimony about his criminal record and pending criminal charges violated the rules of evidence and deprived him of his right to a fair trial.  Specifically, the petitioner argued that Quiles's testimony was not only hearsay, it was also irrelevant and prejudicial.  State v. Wideman, supra, 36 Conn. App. at 195, Appendix A.  The Appellate Court rejected each of these arguments.  The court held that the testimony was not hearsay because it was not offered to show the truth of the matter asserted, but rather the victim's state of mind." Id.  The court then observed  that "[a]

---

[5]  On the second day of their deliberations, the jurors asked for the transcript of portions of the testimony and the jury charge to be read back to them.  T. 2/11/93 at 465-73, Appendix K.

victim's fear of another individual is admissible when relevant to the issues at trial." Id.  The court noted that the victim's state of mind is relevant in crimes such as kidnaping and sexual assault because they can be accomplished by "force or threat of force." Accordingly, the court ruled that "the victim's testimony, which revealed her fear of the [petitioner], was relevant to the kidnaping and sexual assault counts."  The court stated that the victim's "state of mind explained why she performed fellatio on the [petitioner] without the use of physical force by him." Id., at 196.  Finally, the Appellate Court held that the trial court conclusion that the testimony was more probative than prejudicial was not an abuse of discretion, "especially in light of the limiting instructions given to the jury on the issue." Id., at 197-98.

The petitioner next claimed that the trial court abused its discretion when it relied on the coconspirator exception to the hearsay rule in permitting Michael Epps to testify regarding statements that were made to him by Kevin Rogers and other coconspirators when they beat him.  The Appellate Court found that "Epps was beaten to keep him from interfering with the sexual assault on the victim, which was the object of the conspiracy." State v. Wideman, supra, 36 Conn. App. at 201, Appendix A.  The court also found that the conspiracy remained in existence at the time that Epps was beaten because Kevin Rogers later told Quiles that she was "not done yet." Id.  Accordingly, the court found that the Epps's testimony was admissible under the coconspirator exception to the hearsay rule. Id.

The petitioner next claimed that there was insufficient evidence to show that he had aided and abetted the other members of the group in sexually assaulting Quiles.  The Appellate Court rejected the petitioner's claim.  The court found that the petitioner's

17

presence while Quiles was being assaulted and his laughing and jeering as he watched intimidated Quiles and, therefore, facilitated the other men in committing their sexual assaults upon her.   State v. Wideman, supra, 36 Conn. App. at 202-203, Appendix A. Accordingly, the court held that the record included sufficient evidence to show that the petitioner "shared the requisite criminality of intent and community of unlawful purpose of his confederates." Id., at 203.

Finally, the petitioner claimed that the trial court's failure to ascertain which crime the jury found that he had conspired to commit violated his right to due process of law. State v. Wideman, supra, 36 Conn. App. at 204, Appendix A.  The information charged the petitioner with conspiring to commit two substantive crimes: sexual assault in the first degree and kidnaping in the first degree. The trial court correctly instructed the jury that to find the petitioner guilty of conspiracy, the jury had to agree unanimously that he had conspired to commit one crime, or the other, or both.  The trial court, however, did not require the jury to return a special verdict stating which of the crimes it found the petitioner had conspired to commit.   In rejecting the petitioner's claim, the court noted that the penalty for conspiracy would be the same regardless of on which crime the jury had based its verdict.  The court also noted that the petitioner was convicted of both the kidnaping and sexual assault charges.  Accordingly, the court held that the trial court had not violated the petitioner's due process rights in accepting the jury's verdict on the conspiracy charge. Id., at 205-206.

The petitioner filed a petition for certification to appeal from the judgment of the Appellate Court.  The Connecticut Supreme Court denied the petition for certification. State v. Wideman, supra, 232 Conn. 903, Appendix B.

18

**C.    The Petitioner's State Habeas Corpus Proceedings**

The petitioner then filed a petition for a writ of habeas corpus pursuant to General

Statutes §52-466 and Practice Book §23-21, *et seq*.  On July 23, 1999, the petitioner filed

an amended petition in which he claimed that his imprisonment was unlawful because he

received ineffective assistance of counsel from Attorney Butler at his trial.  See "Amended

Petition" at 1-3, Appendix N.  Specifically, the petitioner claimed that Butler "failed to

investigate possible defenses" to the charges against him and that Butler "deprived [him]

of his of his right to testify at trial." Id., at 3.[6]

The hearing on the petitioner's habeas corpus petition began on May 26, 2000.  The

petitioner took the stand as the first witness in the case.  The petitioner testified that he had

strongly desired to testify at his trial.  The petitioner testified, however, that despite his

desire to tell the jury his side of the story, Attorney Butler repeatedly told him that he could

not testify. The  petitioner testified as follows:

> I felt that I should testify on my own behalf, because it was my conception
> that if a jury don't see you testify that they would take influence [sic] that
> you're guilty.  If you don't say anything.  And I wanted to testify but he kept
> on telling me that you can't, that you would loose you're right to appeal.  And
> I didn't totally understand that.  And I kept telling him, but I want to testify on
> my own behalf because I hadn't did anything.  And he was like, well, you're
> going to lose your appeal on things that she might have – because she
> mentioned that I was in jail for two bodies and that I was out on bond for a
> double homicide.  And the jury looking at me like I'm the devil itself.

T. 5/26/00 at 8-9, Appendix O.

---

[6]  The second count of the petitioner's amended petition also alleged that the trial court
denied the petitioner his right to due process when it failed to ensure that his waiver of his
right to testify was "intelligent, knowing and voluntary." "Amended Petition" at 3, Appendix
N.  However, the petitioner withdrew this claim at the outset of the hearing on his habeas
corpus petition. T. 5/26/00 at 1-2, Appendix O.

The petitioner then claimed that he was surprised when Attorney Butler informed the trial court that he was not going to testify.  The petitioner testified that:

> I thought when the judge, when they asked did I want to testify I thought he was going to say yes, but he didn't.  And I didn't want to get into no argument in front of him in the courtroom because I really wanted to testify but I really didn't want to hurt myself any further in the courtroom.

T. 5/26/00 at 10, Appendix O.  The petitioner's counsel then asked the petitioner what he meant by hurting himself in the courtroom.  The petitioner explained that he did not inform the court that he did want to testify because he did not want to contradict his attorney in front of the jury.  The petitioner testified that:

> Because if I would have been arguing with him, saying, yeah, I do want to testify, and he's saying that I thought you didn't want to and I'm saying I did, then the jury would have seen all that.

Id., at 10-11.[7]

The petitioner then testified about his prior convictions and other involvement in criminal activities to which Grace Quiles had referred in her testimony at trial.  The petitioner testified that he had two convictions for manslaughter prior to the incident that led to his being charged with  kidnaping and sexually assaulting Quiles.  The petitioner explained that his first conviction for manslaughter resulted when he accidently shot and killed his best friend when he was eighteen years old.  The petitioner testified that he was sentenced to serve  two years in prison on that conviction.  The petitioner testified that his second conviction for manslaughter was the result of an incident in which he shot and killed another man in self defense.  He testified that he was sentenced to serve five years in

---

[7]  The jury was not present in the courtroom when Attorney Butler informed the trial court that the petitioner had decided not to testify. T. 2/9/93 at 344-45, Appendix I.

prison on that conviction. T. 5/26/00 at 11, Appendix O; see Connecticut State Police Criminal Record for John Wideman (hereinafter "Petitioner's Criminal Record"), App. P.

The petitioner also testified that at the time of the incident with Quiles, he was released on bond from a charge capital felony that was the result of his involvement in a double homicide. The petitioner acknowledged that he was present during the double homicide but denied that he participated in the killings. The petitioner testified that he was convicted of attempted robbery as a result of the incident and that he was sentenced to serve ten years in prison on that conviction. T. 5/26/00 at 12-13, Appendix O; see Petitioner's Criminal Record, Appendix P.

The petitioner's direct testimony concluded with the following exchange between the petitioner and his counsel:

> PETITIONER'S COUNSEL:  Returning now to your discussions with Mr. Butler, do you have any recollection of the number of times you might have discussed with Mr. Butler your desire to testify?
>
> PETITIONER: Every time me and him talked.  Every time that he asked me and every time that I felt it I brought it up to him that I feel I should testify.
>
> PETITIONER'S COUNSEL: And was his response to you the same each time you brought it up?
>
> PETITIONER:  Each time.
>
> PETITIONER'S COUNSEL: And his response was, sir?
>
> PETITIONER:  His response ... was if you testify you would lose this issue in court, an appellate issue.  In some ways when he said that it had me feeling that if I testified that I would lose an issue that was overwhelming, that the Appellate Court just couldn't overlook the issue.  And I felt that – when he said to me I was like, you know, I wanted to testify but he's saying to me, you're going to lose this issue and it's a great issue.  They can't possibly overlook this issue.  And I'm saying to myself, but I still want to testify.  I'm saying to him that I still wanted to testify.

> And when it came time for me to testify I thought that he was going to say he's going to testify, but he said he wasn't, and I didn't want to argue with him in open court in front of the jury.

T. 5/26/00 at 16-17, Appendix O.

The petitioner also testified that there was evidence that cast doubt on Quiles's testimony that Attorney Butler did not present. Specifically, the petitioner testified that there was evidence to suggest that Grace Quiles did not fear him as she testified at trial. The petitioner testified that Butler never presented evidence that Grace Quiles had picked him up while driving a taxi after the incident. The petitioner also testified that Quiles was a frequent visitor at his mother's house. T. 5/26/00 at 47-48, Appendix O.

After counsel for the respondent cross-examined the petitioner; T. 5/26/00 at 18-47, 52-56, Appendix O; the habeas court adjourned the hearing for the day. Id., at 56.

The hearing on the petitioner's state habeas corpus petition resumed on July 12, 2000. The petitioner called Attorney Thomas Farver, a defense attorney from New Haven, as an expert witness to testify on whether Butler's representation of the petitioner met the standard of "reasonably   effective assistance." See Strickland v. Washington, supra, 466 U.S. at 687. Petitioner's counsel asked Farver to describe the process that an attorney and his client would undertake in deciding whether the client should testify in a criminal trial. In response, Attorney Farver testified as follows:

> Well, obviously, the client has an absolute right to take the stand if he desired to do so. And the standard requires that his counsel explain that right to him: that he has the right to do so. And it also – requires him to explain the pros and cons in any given case as to whether he advises him one way or the other as to what he thinks is in his best interest.

T. 7/12/00 at 13, Appendix Q. Attorney Farver testified further, as follows:

> There are cases, certainly, I think that it's appropriate for you to advise a client not to take the stand. But it's got to be his decision. It's – and I believe that's a constitutional right. Our case law[ has borne] that out: that it's not a decision that's left in the hands of the attorney to make.

T. 7/12/00 at 13, Appendix Q.

Counsel for the petitioner then asked Attorney Farver a question based on the following hypothetical situation:

> [P]lease assume the following facts: Your client has a previous record of two felonies, specifically two killings. He's currently charged with kidnaping in the first degree and sexual assault in the first degree among other charges. The victim of the sexual assault and kidnaping takes the stand and testifies under the state of mind exception to the hearsay rule that she was afraid of the client ... because he had previously been convicted for two bodies.

T. 7/12/00 at 15, Appendix Q. Counsel for the petitioner continued, as follows:

> The defense ... counsel vociferously argues against allowing the information in. The judge gives a limiting instruction to the jury.... [U]nder that set of circumstances, how would you advise a client as to whether or not to take the stand if he claimed consent?

Id., at 15-16. Attorney Farver offered the following comments on the hypothetical situation posed by counsel for the petitioner:

> Well, you've got two conflicting issues.... I don't know that you can say, How would you advise your client? I mean, you've got to be there and observing how the witness is perceived and hopefully make some judgment call as to how the jury is perceiving the credibility of the victim as a witness.

Id., at 16. Attorney Farver then stated that he would "generally ... be inclined to tell [his] client ... to take the stand" when "it's a sex crime and it's a consent defense." Id. Farver stated however, that the "down side" is that the "prior felony convictions ... are then going to be coming in to impeach him...." Id., Farver then testified as follows:

> Again, it's never a clean you must testify or you shouldn't testify; it's always going to be a balancing of what the perceptions are of the attorney and of the client during the course of the trial.

> And also how does the client present himself?  If ... he comes off extremely negative, the less he says in front of the jury the better off you are.  And that's got to be a concern.

Id., at 17.

Finally, counsel for the petitioner concluded her examination of Farver by asking if he were  familiar with the tactic of keeping a client off the stand in order to preserve an appellate issue.  Farver replied that although he could not recall doing so himself, he did know of other attorneys who had employed such a tactic.  Farver commented that:

> It certainly can be a tactic.  It can be a valid tactic.  I wouldn't say that it isn't.  But it's also a very long shot.

T. 7/12/00 at 18, Appendix Q.

During the cross-examination of Attorney Farver by counsel for the respondent, the habeas court asked Farver if it would have been better, under the facts of this case, for Attorney Butler to have put the petitioner on the stand to testify that the victim had consented to having sex with him, even if that would have exposed him to impeachment with his prior convictions, or to preserve the appellate issue and hope to win the case on appeal. T. 7/12/00 at 37-38, Appendix Q. Attorney Farver responded to the court's question as follows:

> I would say that it is not below the standard to make a tactical decision either way, either to recommend to your client that he take the stand or to recommend that he not.  No, I don't think that that would fall below, because – as the scenario that you've given me certainly suggests that there are logical and well-thought-of reasons for both sides of it.

T. 7/12/00 at 38, Appendix Q.

After counsel for the respondent completed her cross-examination of Attorney Farver, the counsel for the petitioner rested. T. 7/12/00 at 41, Appendix Q.  The counsel

for the respondent then called Attorney Barry Butler as her witness.  Attorney Butler testified that when preparing for trial in this case, he was concerned about the petitioner's prior convictions for manslaughter and the fact that on the day of the alleged abduction and assault upon Grace Quiles, the petitioner had been released on bond after being arrested in connection with a double homicide. Id., at 49-52.  Butler testified that he told the petitioner that it would be "extremely prejudicial for [the] jury to hear anything about the prior homicides as well as [the fact that he] was out on bond on a double homicide...." Butler told his client that he would have to "fight tooth and nail" to keep information about his record and the pending charges away from the jury. Id., at 58.

Butler testified that in order to keep the jury from hearing about the petitioner's other criminal conduct, he filed two motions *in limine* prior to trial.  Both motions were denied. T. 7/12/00 at 53, 58, Appendix Q.  During the trial, Butler objected when the state offered the information through the testimony of Grace Quiles.  After the court overruled his objection and permitted Quiles to testify about the convictions and the pending charges, Butler moved for a mistrial.  His motion for a mistrial was denied. Id., at 53-54.

Butler testified that he initially thought that the petitioner should testify because he planned to rely on a consent defense. However, when the trial court denied his motions *in limine* and permitted Quiles to testify regarding the petitioner's record and the charges pending against him, Butler had to reconsider. T. 7/12/00 at 59, 64, Appendix Q.  Butler ultimately concluded that the petitioner should not testify for three reasons.  First, Butler believed that if the petitioner were convicted, he would have an excellent chance to have his conviction reversed on appeal if he claimed that the trial court erred in allowing Quiles to testify regarding the petitioner's record and pending charges.  Butler believed, however,

25

that if the petitioner testified, it would impair his ability to win on appeal.  Butler was concerned that the reviewing court would find that the petitioner had "opened it all up" by testifying.  He was also concerned that the petitioner's testimony would render any error in the court's ruling to be harmless. Id., at 61-63, 65.  Second, Butler was concerned that if the petitioner testified, the state would be able to present additional information regarding the petitioner's criminal record.  When Quiles testified, she had said only that the petitioner "did time for two bodies."  Butler believed that if the petitioner testified, it would open the door for the state to present more detail about all of the crimes of which he had been convicted. Id., at 61, 66; see T. 2/3/93 at 101,  Appendix F.  Finally, Butler testified that he did not want the petitioner to be cross-examined on the incident that led to his being charged with capital felony.  Butler was especially concerned about the petitioner being cross-examined on that incident because the capital felony charges were still pending against him at the time of trial in this case. T. 7/12/00 at 61, Appendix Q.

Butler testified that while he "strenuously voiced [his] opinion" that the petitioner should not take the stand, "ultimately it was [the petitioner's] decision not to testify." T. 7/12/00 at 60, 64-65,  Appendix Q.  Butler also testified that he informed the trial court on the record that he had discussed the matter with him and the petitioner had decided not to testify. Id., at 72; see T. 2/9/93 at 344,  Appendix I.

Butler testified that during his cross-examination of Grace Quiles, he asked her if she had ever picked up the petitioner in a taxi after the incident in which she claimed that he had assaulted her.  Quiles acknowledged that she did so on two occasions. T. 7/12/00 at 66-69, Appendix Q; see T. 2/8/93 at 184-85, Appendix H.  Butler also testified that in his final argument to the jury, he argued that if Quiles feared the petitioner to the degree that

26

she claimed, she would not have picked him up.  T. 7/12/00 at 84-85, Appendix Q; see T.

2/10/93 at 374,  Appendix J.

Butler also described  his efforts to impeach Quiles's credibility when he cross-

examined her.  He testified, as follows:

> [W]e impeached her with her prior convictions.  I believe we impeached her
> with what I thought were lies and untruths.  I think we impeached her with the
> fact that in the past she had traded sex for money or worked off debt with
> Kevin Rogers, who was in business down there.  And she had owed him
> money in the past for crack cocaine.  I brought up the fact that she did crack,
> she did cocaine.  She drank.  We brought up the fact that she'd been
> involved in prostitution.  And we tried to generally show that she was a liar,
> a whore, and a thief.

T. 7/12/00 at 73,  Appendix Q.  Butler testified that based on his cross-examination of

Quiles, he argued to the jury that "[s]he was not credible" and 'not deserving of

believability." Id., at 74.   Butler believed that he had effectively impeached Quiles's

credibility. Id., at 107.

While Butler was being cross-examined by the petitioner's counsel, he testified that

at the time of the trial, he knew that the petitioner's mother and sister had claimed that

Grace Quiles told them that the petitioner's involvement in the crime against her was

relatively minor.  He also acknowledged that he did not call them as witnesses to have

them testify to that effect.  Butler explained that he did not call them because he thought

that their testimony would not be consistent with the consent defense on which he was

relying. T. 7/12/00 at 94-95, 108-110, Appendix Q.[8]

---

[8] During Attorney Butler's cross-examination of Grace Quiles at the petitioner's trial, he
asked  her whether she had told the petitioner's mother that the petitioner "was never
involved in any sex." T. 2/8/93 at 184,  Appendix H.  Quiles denied that she had made such
a statement. Id.

On October 3, 2000, the habeas court issued a memorandum of decision denying the relief requested in the petitioner's state petition for a writ of habeas corpus. "Memorandum of Decision" at 8, Appendix C.  The court stated that:

> For the Petitioner to prevail on his claim of ineffective assistance of counsel, he must establish both that his counsel's performance was deficient and that there is a reasonable probability that, but for counsel's mistakes, the result of the proceeding would have been different.

Id., at 8, citing Johnson v. Commissioner of Correction, 58 Conn. App. 482, 484, 755 A.2d 268 (2000); Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The habeas court found that when Attorney Butler was faced with what he considered a "Hobson's choice" regarding whether the petitioner should testify, he advised his client not to testify and informed him of the reasons why he should not do so. "Memorandum of Decision" at 5, Appendix C.  The habeas court credited Butler's testimony and specifically found that the petitioner "decided not to testify." Id.  The court found that "under all the circumstances, [Butler's] recommendation to [the petitioner] was a valid trial tactic and that his performance in this regard did not fall below the range of competence displayed by lawyers with ordinary skill in criminal law." Id.

The court also found that Butler's decisions regarding the presentation of evidence tending to exculpate the petitioner did not fall below the required standard of competence. The court noted that during Butler's cross-examination of Grace Quiles, he elicited testimony that she had picked up the petitioner on two occasions after the alleged kidnaping and sexual assault.  The court also noted that Butler used Quiles's admission appropriately during final argument to discredit her assertion that she feared the petitioner.

28

"Memorandum of Decision" at 7, Appendix C.   The court also found that Butler's representation of the petitioner was not deficient because he failed to call the petitioner's father and sister to testify that Quiles had told them that the petitioner "wasn't all that involved" in the crime. Id.  The court found that when Butler questioned Quiles about the alleged statements, she admitted making them.  The court ruled, therefore, that there was no reason to call the petitioner's father and sister to testify to that Quiles had, in fact, made the statements. Id.[9]

Finally, the habeas court found that even if the Attorney Butler's performance were deficient for the reasons claimed by the petitioner, it did not make any difference in the outcome of the trial. "Memorandum of Decision" at 8, Appendix C. The court held, therefore, that the petitioner failed to meet his burden on either prong of the Strickland test. Id.[10]

After the habeas court denied the petitioner relief on his state habeas corpus petition, the petitioner appealed to the Connecticut Appellate Court.   In a *per curium* decision, the Appellate Court held that the habeas court had properly ruled that the petitioner "failed to rebut the strong presumption that 'counsel's conduct [fell] within the

---

[9]  The habeas court misconstrued both the petitioner's claim and the record in making this finding.  First, the petitioner claimed that Grace Quiles made statements regarding the minimal nature of his participation in the crime to his mother and sister, not his father and sister. T. 7/12/00 at 94-95, Appendix Q. Second, when Butler had cross-examined Quiles regarding a statement of this nature that she had allegedly made to the petitioner's mother, Quiles denied that she had made the statement. T. 2/8/93 at 184,  Appendix H.

[10]  The habeas court also rejected the claim raised in the second count of the habeas corpus petition; "Memorandum of Decision" at 7-8, Appendix C; apparently overlooking the fact that petitioner had withdrawn the claim on the first day of the hearing. See T. 5/26/00 at 2, Appendix O.

wide range of reasonable professional assistance....'" (Alteration in original.) Wideman v.
Commissioner of Correction, supra, 67 Conn. App. at 741, quoting Safford v. Warden, 233
Conn. 180, 193, 612 A.2d 1161 (1992).  Accordingly, the Appellate Court affirmed the
judgment of the habeas court. Wideman v. Commissioner of Correction, supra.  The
petitioner filed a petition for certification to appeal which was denied by the Connecticut
Supreme Court. Wideman v. Commissioner of Correction, 260 Conn. 906, 795 A.2d 547
(2002).

## III.    ARGUMENT

### A.    Standard Of Review Governing Federal Habeas Corpus Petitions

The standard governing review of claims by federal habeas corpus petitioners is set
forth in §28 U.S.C 2254 (d), as amended by the Antiterrorism and Effective Death Penalty
Act of 1996 (hereinafter "AEDPA"). The act amended §2254(d) to read as follows:

> (d)   An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with
> respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law,
> > as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in
> > the State court proceeding.

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the
United States Supreme Court recognized that when Congress enacted AEDPA, it "placed
a new restriction on the power of federal courts to grant writs of habeas corpus to state
prisoners." Id. at 399.  The court stated that §2254 (d)(1) "prohibits a federal court from

granting a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id.  Thus, when considering an application for a writ of habeas corpus by a state prisoner, federal courts must ask three questions to determine whether habeas  relief should be granted: "(1) Was the principle of the Supreme Court case law relied upon by the petitioner 'clearly established'  when the state court ruled? (2) If so, was the state court's decision 'contrary to' that established Supreme Court precedent?  (3) If not, did the state court decision constitute an 'unreasonable application' of that principle?"  Williams v. Artuz, 237 F.3d 147, 152 (2nd Cir. 2000), cert. denied, 534 U.S. 924, 122 S.Ct. 279, 151 L.Ed.2d 205 (2001).

Accordingly, when considering a state prisoner's petitioner's application, federal courts must first determine whether the petitioner's claim "is based on a principle of Supreme Court case law that was 'clearly established' when the state court ruled." Lurie v. Wittner, 228 F.3d 113, 125 (2nd Cir. 2000), cert. denied, 532 U.S. 943, 121 S.Ct. 1404, 149 L.Ed.2d 347 (2001); accord Williams v. Taylor, 529 U.S. at 390, ("The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time the state-court conviction became final.").  When making this determination, the court should be mindful that  "the phrase 'clearly established Federal law, as determined by the Supreme Court' refers only 'to  the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Lurie v. Wittner, supra, 125, quoting Williams v. Taylor, supra, 412.

Where the petitioner's claim is based on clearly established Supreme Court case law, the federal court must determine whether the state court's ruling is in conflict with that precedent. In <u>Lurie v. Wittner</u>, <u>supra</u>, the Second Circuit held that a "state court decision is 'contrary to' existing Supreme Court precedent (i) when it applies a rule of law 'that contradicts the governing law set forth in' the Supreme Court's cases . . . or (ii) when it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." <u>Id</u>., 228 F.3d at 127, <u>quoting</u> <u>Williams v. Taylor</u>, 529 U.S. at 406; <u>see</u> <u>also</u> <u>Price v. Vincent</u>, 538 U.S. 634, 640, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003); <u>Kennaugh v. Miller</u>, 289 F.3d 36, 42 (2nd Cir.), <u>cert</u>. <u>denied</u>, 537 U.S. 909, 123 S.Ct. 251, 154 L.Ed.2d 187 (2002).  "In either event, a state court decision is 'contrary to' Supreme Court precedent only if it is 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed' to the precedential holding." <u>Lurie v. Wittner</u>, <u>supra</u>, 127, <u>quoting</u> <u>Williams v. Taylor</u>, <u>supra</u>, 405.

Where the state court's decision is not directly opposed to Supreme Court precedent, but does involve an application of the Supreme Court's case law, a federal court considering a state prisoner's habeas corpus petition corpus must determine whether the state court's application of federal law was unreasonable. <u>Lurie v. Wittner</u>, <u>supra</u>, 128-29.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the [the Supreme] court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Clark v. Stinson</u>, 214 F.3d 315, 321 (2nd Cir. 2000) <u>cert</u>. <u>denied</u>, 531 U.S. 1116, 121 S.Ct. 865, 148 L.Ed.2d 778 (2001); <u>see</u> <u>also</u> <u>Kennaugh v. Miller</u>, 289 F.3d at 42.

In Williams v. Taylor, supra, the Supreme Court identified two principles to guide the lower federal courts in applying the reasonableness standard of §2254 (d)(1).  First, the court made clear that the reasonableness of the application of federal law by state courts would be judged by an objective standard.  Justice O'Connor, writing for the court, stated that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id., 529 U.S. at 409.  Second, the court emphasized that an unreasonable application of federal law is different from an application that is simply incorrect or erroneous.  The court stated that:

> In §2254 (d)(1), Congress specifically used the word "unreasonable" and not a term like "erroneous" or "incorrect."  Under §2254 (d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

Williams v. Taylor, supra, 411; accord Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curium).

Finally, the provisions of §2254 (d)(1) require the federal courts to give great respect to the process provided by state courts, which are equally empowered to interpret and enforce the federal constitution, when determining whether to grant habeas corpus relief.  See Sawyer v. Smith, 497 U.S. 227, 241, 110 S.Ct. 2822, 111 L.Ed.2d 193, rehearing denied, 497 U.S. 1051, 111 S.Ct. 17, 111 L.Ed.2d 830 (1990) ("State courts are coequal parts of our national judicial system and give serious attention to their responsibilities for enforcing the commands of the Constitution.").

33

**B.     Federal Habeas Relief is not Warranted On The Petitioner's Claim**

In his "Memorandum in Support of Petition," the petitioner contends that he is entitled to relief under §2254(d)(1) because "the Connecticut courts have deviated in a significant way from the Sixth Amendment law clearly articulated in Strickland v. Washington, [supra], and it's progeny [in rejecting his ineffective assistance claim]." Petitioner's Memorandum at 13. Under AEDPA, "a federal court cannot grant habeas [relief] in a case in which there was an adjudication on the merits in a state court proceeding unless the adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' 28 U.S.C. §2254(d)(1)." Cox v. Donelly, 387 F.3d 193, 197 (2nd Cir. 2004). When the state court decision in this case is considered, it clear that it is neither "contrary to" or "an unreasonable application of" the Supreme Court's decision in Strickland.

**1.     The state court decision is not "contrary to"
clearly established federal law**

A decision is "contrary to" clearly established federal law if the state court arrives at a legal conclusion "opposite to" that reached by the Supreme Court or if the state court decides a case differently than the Supreme Court has "on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. at 412-13. The petitioner makes no claim that either of these events occurred nor would the record in this case support such a claim. Accordingly, the state court decision in this case is not "contrary to" clearly established federal law.

2.    **The state court decision is not an unreasonable application of clearly established federal law**

"Under the unreasonable application clause [of §2254(d)(1)] , a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decision but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, supra, 413.  In this case, the petitioner claims that the Connecticut courts applied the decision in Strickland v. Washington unreasonably in rejecting his claim that his counsel was ineffective in advising him not to testify. "Petitioner's Memorandum" at 12-13.  "The test for ineffective assistance of counsel established in Strickland requires a defendant to show that counsel's performance 'fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Cox v. Donelly, 387 F.3d at 197, quoting Strickland v. Washington, 466 U.S. at 688, 694.

In order to prevail on his claim, the petitioner "must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under §2254(d)(1), it is not enough to convince a federal habeas court that, in it's independent judgment, the state court applied Strickland incorrectly.  Rather, he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner." Bell v. Cone, 535 U.S. 685, 698-99, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).  In this case, the petitioner's claim fails because he cannot make the required showing with respect to either prong of the Strickland test.

### a.    State court reasonably found trial counsel's representation  did not fall below standard

The petitioner claims that the state habeas court and the Appellate Court applied

Strickland  unreasonably in rejecting his claim that his trial counsel, Attorney Barry Butler,

was ineffective in advising him not to testify. "Petitioner's Memorandum" at 12-13.  At the

hearing on his state habeas petition, Butler testified that he advised the petitioner not to

testify for three reasons.  First, Butler believed that if the petitioner were convicted, he

would have an excellent chance to have his conviction reversed on appeal if he claimed

that the trial court erred in allowing Grace Quiles to testify regarding the petitioner's record

and pending charges.  Butler believed, however, that if the petitioner testified, it would

impair his ability to win on appeal.  Butler was concerned that the reviewing court would

find that the petitioner had "opened it all up" by testifying and that his  testimony would

render any error in the court's ruling to be harmless. T. 7/12/00 at 61-63, 65, Appendix Q.

Second, Butler was concerned that if the petitioner testified, the state would be able to

present additional information regarding the petitioner's criminal record.  When Quiles

testified, she had said only that the petitioner "did time for two bodies."  Butler believed that

if the petitioner testified, it would open the door for the state to present more detail about

all of the crimes of which he had been convicted.  Finally, Butler testified that he did not

want the petitioner to be cross-examined on the incident that led to his being charged with

capital felony.  Id., at 61, 66.  In addition, Butler believed that the petitioner's testimony was

not necessary because he had effectively impeached Quiles's testimony when he cross-

examined her. Id. at 107.

36

The state habeas court ruled that Butler's recommendation that the petitioner not testify "was a valid trial tactic and that his performance in this regard did not fall below the range of competence displayed by lawyers with ordinary training and skill in criminal law." "Memorandum of Decision" at 6, Appendix C. In considering the reasonableness of Butler's advice, the habeas court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland v. Washington, 466 U.S. at 689. "Judicial scrutiny of counsel's performance must be highly deferential .... [and] every effort must be made to eliminate the distorting effects of hindsight." Id., quoting Michel v. Louisiana, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83 (1955). When the state habeas court's decision is considered in light of these principles, it is clear that the court applied Strickland reasonably. Cf., Pavel v. Hollins, 261 F.3d 210, 216 (2nd Cir. 2001) (strategic decision is a "conscious reasonably informed decision made by an attorney with an eye to benefitting his client").[11]

---

[11] In the state habeas proceeding, the court made two other rulings not challenged in the petitioner's federal habeas corpus petition. In his state habeas, the petitioner claimed that Attorney Butler was ineffective for failing to question Grace Quiles regarding the fact that she picked up the petitioner in her taxi cab after the alleged abduction and assault took place. The court rejected this claim because its examination of the record revealed that Butler did question Quiles about that fact when he cross-examined her and he subsequently used her admission that she did pick up the petitioner in his closing argument. "Memorandum of Decision" at 6, Appendix C.

The petitioner also claimed that Butler was ineffective for failing to present testimony from his mother and sister to the effect that Quiles had stated that he was only minimally involved in the attack upon her. The state habeas court found that Butler was not ineffective for presenting this evidence because Quiles had admitted making the statement and "there was no point in bringing [them] in ... to confirm that." Id., at 7. However, the record reveals that when Butler questioned Quiles about the statement, she denied making it. T. 2/8/93 at 184, Appendix H. The record also shows that Butler chose not to present the testimony of the petitioner's mother and sister because their testimony would not have been consistent with the consent defense on which he intended to rely. T. 7/12/00 at 94-

b.    **State court reasonably found that petitioner was not prejudiced by counsel's alleged errors**

In order for this court to conclude that the petitioner was denied his right to effective assistance of counsel, the court must determine not only that counsel's conduct was objectively unreasonable, but also that the outcome of the petitioner's trial would have been different if he had testified. See Pavel v. Hollins, supra, 216; Lindstadt v. Keane, 239 F.3d 191, 198-99 (2nd Cir. 2001).  The state habeas court concluded, without elaboration, that the results of the petitioner's trial "would not have been different" even if Attorney Butler's performance had been deficient. "Memorandum of Decision" at 8, Appendix C. When a state court fails to articulate its reasoning for denying an ineffectiveness of counsel claim, the federal habeas court must review trial counsel's performance independently to determine if the state court's conclusion was a reasonable application of Strickland. See Eze v. Senkowski, 321 F.3d 110, 125 (2nd Cir. 2003); Aeid v. Bennet, 296 F.3d 58, 62 (2nd Cir. 2002).  When such a review is undertaken in this case, it is clear that the petitioner cannot show that the outcome of his trial would have been different if he had testified.

At trial in this case, the state presented compelling evidence of the petitioner's guilt of a shocking crime.  The victim, Grace Quiles, presented graphic testimony regarding her harrowing abduction, degrading treatment and repeated sexual assaults at the hands of the petitioner and his co-conspirators.  Quiles's testimony was corroborated by the

---

95, 108-110, Appendix Q.  The record, therefore, supports the  court's conclusion that Butler was not ineffective for failing to call the petitioner's mother and sister as defense witnesses.  The state habes court's ruling in this regard was, therefore, a reasonable application of Strickland.

testimony of her boyfriend, Michael Epps.  Epps testified that he attempted to rescue Quiles from her captors, that after being run off, he called the police, and that he was beaten severely in retribution for reporting the crime to the authorities.  Both Quiles and Epps testified that after the incident, they were afraid to report the attacks upon them to the police.  They both testified that after one of the petitioner's co-conspirators threatened Epps's life and told Quiles that she would be targeted for further sexual assaults, they finally reported the crimes and identified their assailants, including the petitioner, to the police.  The testimony of both Quiles and Epps was corroborated by the testimony of Detective Bruce Belco, the Bridgeport police officer who responded to Epps's original, anonymous complaint and who subsequently interviewed him at the hospital after he was beaten.  Finally, Quiles's testimony regarding her abduction and the repeated sexual assaults upon her was corroborated by the  medical personnel who treated her at Bridgeport Hospital and Detective Judith Tesla, the Bridgeport police officer to whom she gave a statement.

In the face of this overwhelming evidence, it is absurd to suggest that the outcome of the petitioner's trial would have been different if he had merely testified that Quiles voluntarily submitted to the humiliation and degradation to which she was subjected.  This is especially true in light of the fact that if the petitioner testified, he would have been subject to impeachment for his prior felony convictions.  And if the petitioner had attempted to explain the circumstances of his prior manslaughter convictions during his testimony, it would have opened the door to the state to present more damaging evidence about his criminal activity, just as Attorney Butler had feared.

On this record, it is clear that the petitioner cannot meet his burden of showing that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washinton</u>, 466 U.S. at 694. Accordingly, the state habeas court's ruling that the results of the trial "would not have been different" even if Butler's performance had been deficient was a reasonable application of the Supreme Court's ruling in <u>Strickland</u>.[12]

## IV.    CONCLUSION

For all of the foregoing reasons, the petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. §2254 should be denied.

Respectfully submitted,

JOHN J. ARMSTRONG
COMMISSIONER OF CORRECTION
STATE OF CONNECTICUT

RESPONDENT

By:_____
MICHAEL E. O'HARE
Supervisory Assistant State's Attorney
Civil Litigation Bureau
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, CT 06067-1829
Tel. No. (860) 258-5887
Fax No. (860) 258-5968
Federal Bar No. ct 02058

---

[12]  Similarly, the petitioner cannot show that the outcome of the case would have been different if Attorney Butler had called the petitioner's mother and sister to testify that Grace Quiles had minimized the petitioner's participation in the crime against her. The jury would have given their biased testimony little weight in the face of the compelling evidence of the petitioner's active participation in the abduction and assaults upon Quiles.

## <u>CERTIFICATION</u>

I hereby certify that a copy of this document was mailed to John R. Williams, Esq.,

counsel for the petitioner, 51 Elm Street, Suite 409, New Haven, CT 06501, Tel. No. (203)

562-9931, Fax No. (203) 776-9494, on May 16, 2005.

_____
MICHAEL E. O'HARE
Supervisory Assistant State's Attorney