```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT


JOHN WIDEMAN,                     :
                                  :
     Petitioner,                  :
                                  :
     v.                           :       CASE NO. 3:02CV1422(AWT)
                                  :
JOHN J. ARMSTRONG,                :
                                  :
     Respondent.                  :
```

RECOMMENDED RULING ON PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, John Wideman, an inmate in the custody of the State of Connecticut, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 claiming that his conviction was obtained in violation of his Sixth Amendment right to effective counsel. Specifically, the petitioner alleges that he was denied effective assistance of counsel because his trial attorney advised him not to testify. For the reasons set forth below, the court recommends that the petition be denied.

I.   Procedural Background

After a jury trial in the state superior court, the petitioner was convicted of kidnaping in the first degree in violation of Conn. Gen. Stat. § 53a-92(a)(2)(A), sexual assault in the first degree in violation of Conn. Gen. Stat. § 53a-70, accessory to sexual assault in the first degree in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-70, and conspiracy to commit kidnaping in the first degree and sexual assault in the first degree in violation of Conn. Gen. Stat. §§ 53a-48, 53a-92 and 53-70. On May 7, 1993, the

petitioner was sentenced to a term of imprisonment of twenty years. The convictions were affirmed by the Connecticut Appellate Court, State v. Wideman, 36 Conn. App. 190 (1994), and the Connecticut Supreme Court denied Wideman's petition for certification to appeal. State v. Wideman, 232 Conn. 903 (1995).

In July 1996, the petitioner filed a petition for a writ of habeas corpus in the Connecticut Superior Court. Following an evidentiary hearing, the state court denied the petition. The Appellate Court affirmed the denial of the petition, Wideman v. Commissioner of Correction, 67 Conn. App. 739 (2002), and the Connecticut Supreme Court denied certification. Wideman v. Commissioner of Correction, 260 Conn. 906 (2002). On August 15, 2002, the petitioner filed the instant habeas petition.

II.  Factual Background

The victim in this case, Grace Quiles ("Quiles"), resided with Michael Epps ("Epps") in an apartment located in building seventeen of Father Panik Village in Bridgeport. (Tr. 2/3/93 at 64.) On the evening of August 24, 1991, as Quiles was walking down a hallway in her building, she and the defendant, John Wideman, had a confrontation. (Tr. 2/3/93 at 66.) The defendant, who did not live in the building, asked Quiles why she had locked the gate that was located at the entrance of the hallway. (Tr. 2/3/93 at 66.) The defendant indicated that he wanted the gate left unlocked so he could sell drugs in the building. (Tr. 2/3/93 at 70.) Quiles

returned to her apartment after the encounter. (Tr. 2/3/93 at 70.) A short time later, Quiles again left her apartment to go downstairs. (Tr. 2/3/93 at 70.) As she was leaving the building, she was confronted by the defendant and six other men: Kevin Rogers, Reggie Rogers, Nate Rogers, Maurice McNeil, Gene Black and Nicholas Wardlaw. (Tr. 2/3/93 at 71.) Kevin Rogers told the victim that she was going to be punished for keeping the gate closed. (Tr. 2/3/93 at 74.) He told her that she had a choice between being "beat down" by the members of the group or performing fellatio on each of them. (Tr. 2/3/93 at 74.) Quiles understood that to be "beat down" meant to be beaten to the point that she would not be able to get up. (Tr. 2/3/93 at 96.) The defendant was present when Kevin Rogers gave the victim the two options. (Tr. 2/3/93 at 75.)

Quiles told the men she did not want to be beaten. They took her to another building in Father Panik Village. (Tr. 2/3/93 at 75.) The victim testified that she did not run away because she was afraid of what the men would do if they caught her. (Tr. 2/3/93 at 83.) According to Quiles, two weeks prior to this incident, Kevin Rogers had beaten her with a belt. (Tr. 2/3/93 at 96-97.) She had seen Kevin Rogers attack and beat people. (Tr. 2/3/93 at 83, 97.) The victim also was afraid of the defendant. (Tr. 2/3/93 at 84.) When the prosecutor inquired why, the petitioner's counsel, Attorney Barry Butler, objected. (Tr. 2/3/93

at 99.)  Attorney Butler argued that there was no foundation for Quiles's testimony regarding prior conduct by the defendant, the prosecutor's question called for a hearsay response and the proffered evidence was unduly prejudicial.[1] (Tr. 2/3/93 at 94, 99, 100.)  The prosecutor contended that Quiles's testimony was necessary to establish the state's theory that Quiles accompanied the petitioner and the other men because she feared for her safety if she did not.  He argued that the testimony was relevant to Quiles's state of mind and was not offered for the truth of the matter.  (Tr. 2/3/93 at 100.)  The trial court overruled the objection.  (Tr. 2/3/93 at 100.)  Before Quiles was permitted to answer the question, the court gave the jury a limiting instruction. (Tr. 2/3/93 at 100-101.)

Quiles testified that approximately one month prior to the incident, her roommate Epps had told her that the defendant "did jail time for two bodies and was out on bond for a double homicide."  (Tr. 2/3/93 at 101.)  The court then gave the jury an additional cautionary instruction about Quiles's testimony.  (Tr. 2/3/93 at 101-102.)

Attorney Butler moved for a mistrial. (Tr. 2/4/93 at 2.)  He argued that in light of Quiles's testimony regarding his client's

---

[1] Defense counsel had filed a motion in limine prior to the trial seeking to preclude evidence of the defendant's criminal history. (Tr. 2/3/93 at 8-33.)  The trial court denied the motion.  (Id. at 33.)

4

criminal history, the petitioner could no longer receive a fair trial. Attorney Butler claimed that Quiles's testimony that the defendant had been involved in four homicides was unduly prejudicial and that the jury no longer viewed the defendant as "someone who is presumed innocent." (Tr. 2/4/93 at 3.) Attorney Butler also argued that Quiles's testimony affected the defendant's decision as to whether to testify. According to Attorney Butler, he and the petitioner had not decided as to whether the petitioner should testify:

> [I]t was our plan to wait and see if he was going to testify or not. The hope was that he would not have to testify. My client doesn't have the best record I have ever had with a client, Your Honor, and for these reasons, we discussed his not testifying and it's noteworthy that throughout the entire voir dire I asked each and every juror if [the defendant] didn't take the stand would you follow the instructions from the court? It was very important to me because the plan was not to have him take the stand if at all possible. Now, he's faced with no choice at all, he has no choice but to take the stand to explain away the conduct and the two bodies and the double homicide that he's out on. . . . .

(Tr. 2/4/94 at 3-4.) The trial court denied the defendant's motion for a mistrial. The court ruled that Quiles's knowledge of the petitioner's prior criminal conduct was more probative than prejudicial and therefore was properly admitted into evidence. The court further held that its limiting instructions protected the defendant from undue prejudice. (Tr. 2/4/93 at 10-11.)

Thereafter, Quiles resumed the witness stand and continued her testimony. (Tr. 2/4/93 at 12.) She testified that she was taken

to an apartment in building thirteen in Father Panik Village. (Tr. 2/4/03 at 23.) The defendant was in the apartment. (Tr. 2/4/93 at 24-25.) The victim performed fellatio on three of the men. One of the men inserted a beer bottle into the victim's vagina as the others, including the defendant, watched and cheered. (Tr. 2/4/93 at 37-38.) The victim was hit with a belt. (Tr. 2/4/93 at 42-43.) When she said she wanted to stop, Nate Rogers pushed her into a stereo and bruised the back of her head. (Tr. 2/4/93 at 39.)

The victim was forced to perform fellatio on the defendant. (Tr. 2/4/93 at 43.) In the meantime, Epps was searching for her. As the victim was performing fellatio on the defendant, Epps knocked on the apartment door. (Tr. 2/4/93 at 43.) Kevin Rogers opened the door and threw a bottle at him. (Tr. 2/8/93 at 220.) The victim went into the bathroom and dressed. (Tr. 2/4/93 at 44.) Epps ran to his sister's apartment and called the police.[2] (Tr. 2/8/93 at 230-231.) Four of the men left the apartment, but the others, including the defendant, remained. (Tr. 2/4/93 at 44.) The defendant forced the victim to undress and to perform fellatio on him again. (Tr. 2/4/93 at 45.) While this was going on, someone called the defendant's name. (Tr. 2/4/93 at 47.) The victim got dressed. (Tr. 2/4/93 at 47.) The defendant opened the door and let the victim leave the apartment. (Tr. 2/4/93 at 48.)

---

[2]Epps gave the police an incorrect apartment number and the police went to the wrong apartment. (Tr. 2/4/93 at 45.)

After calling the police, Epps encountered Kevin Rogers, Reggie Rogers and McNeil. They assaulted him. (Tr. 2/8/93 at 232.)

The next day, as the victim was returning to her apartment, she met Kevin Rogers, Nate Rogers and Reggie Rogers. (Tr. 2/4 93 at 52.) She did not see the defendant. (Tr. 2.4 93 at 52.) Epps was looking out of his apartment window, however, and saw the three men approach the victim with the defendant behind them. (Tr. 2/8/93 at 245.) Kevin Rogers told the victim that she was not done yet and that they were coming back to get her that night. (Tr. 2/4/93 at 55, 70.) When Quiles returned to her apartment, Epps called the police. (Tr. 2/4/03 at 70, Tr. 2/8/03 at 246.) Quiles was examined at the hospital and gave a statement to the police. (Tr. 2/4/93 at 70, 88.)

At the conclusion of the state's case, the defense moved for acquittal. (Tr. 2/9/93 at 338.) The court denied the motion. (Tr. 2/9/93 at 242.) Outside the presence of the jury, the court inquired if the defense was going to call any witnesses. Attorney Butler stated:

> My client is deciding whether or not he's going to testify or not testify. If he does testify, there are pitfalls and we are weighing the decision back and forth. Your Honor, at this time, I've discussed it with my client. We feel that we are not going to have my client testify at two o'clock. For all intents and purposes, the defense at two o'clock will probably rest.

(Tr. 2/9/03 at 343.) After the luncheon recess, but before the

7

jury was brought in, Attorney Butler informed the court that he "had an opportunity to speak to [his] client once again downstairs and he has concluded that it's in his best interest not to take the stand, all things considered, and I agree with that assessment. At this time, [the defense is] going to rest." (Tr. 2/9/03 at 344.)

On February 16, 203, the jury returned guilty verdicts on all counts. (Tr. 2/16/03 at 476-79.) The Appellate Court affirmed[3] and the Supreme Court denied certification.

In July 1993, the petitioner filed a state habeas petition claiming ineffective assistance of counsel. (Ex. N.) He alleged that Attorney Butler "deprived [him] of his right to testify at trial." (Ex. N at 3.)

A two day evidentiary hearing was held in the Connecticut Superior Court (Rittenband, J.) (Ex. O.) The petitioner was represented by counsel. The petitioner testified he had two prior convictions for manslaughter and, at the time of the incident with Quiles, was charged with two murders and was out on bond. (Tr. 5/26/93 at 11, 13, 25-26.) He testified that he understood that if he took the stand, the jury would have heard that he had been twice convicted of manslaughter and was out on bond facing two murder charges. (Tr. 5/26/00 at 27.) The jury would learn that Quiles's testimony about his crimes was correct. The petitioner maintained,

---

[3]On appeal, the defendant challenged, <u>inter alia</u>, the trial court's admission of Quile's testimony regarding the defendant's prior criminal conduct.

however, that although his criminal record would be before the jury, they could hear his side of the story. (Tr. 5/26/00 at 27.) He also wanted to testify because he believed that if he did not, the jury would infer that he was guilty. (Ex. O, Tr. 5/26/00 at 8-9.) The petitioner testified that he repeatedly told Attorney Butler that he wanted to testify. Attorney Butler responded that the petitioner could not testify because he "would lose [his] right to appeal" the issue of the admission of Quiles's testimony regarding his criminal history. (Ex. O, Tr. 5/26/00 at 8.) The petitioner claimed that he was surprised when Attorney Butler informed the court that the petitioner was not going to testify. (Tr. 5/26/93 at 10.) He testified that he did not, however, say anything at the time because he did not want to argue with his attorney in front of the jury.[4] (Tr. 5/26/93 at 10-11, 17.)

The petitioner's expert, Attorney Thomas Farver, testified regarding whether Attorney Butler's representation of the petitioner met the standard of reasonably effective assistance. Attorney Farver testified that in advising a client regarding whether to testify "you've got to . . . observ[e] how the witness is perceived and hopefully make some judgment call as to how the jury is perceiving the credibility of the victim as a witness."

---

[4] However, as the state pointed out to the court, the jury was not present in the courtroom when Attorney Butler told the court that the petitioner was not going to take the stand. (Ex. O, Tr. 5/26/00 at 38.)

(Ex. Q, Tr. 7/12/00 at 16.) He further stated that he would be inclined to advise a client to testify where, as in this case, the charges involved sexual assault and the defense's theory was consent. (Tr. 7/12/00 at 16.) Attorney Farver acknowledged that the petitioner's credibility would be impeached by his prior felony convictions. (Tr. 7/12/00 at 16.) Attorney Farver testified that he knows of lawyers who have sought to protect an appeal issue from being rendered harmless error by having their client not testify. (Tr. 7/12/00 at 18, 20.) Although Attorney Farver stated that ultimately it is the client's decision as to whether to testify, he opined that it is a valid and reasonable trial strategy for counsel to recommend that the client not testify. (Tr. 7/12/00 at 20-21.) He concluded that under the circumstances Attorney Butler's recommendation did not fall below an objective standard of reasonableness. (Tr. 7/12/00 at 38, 40.)

Attorney Butler also testified. He acknowledged that the ultimate decision as to whether to testify belongs to the client. (Tr. 7/12/00 at 58.) Attorney Butler testified that initially the plan was for the petitioner to testify because "it was a consent case and it was important to explain his side of things." (Tr. 7/12/00 at 59, 64.) In addition, the petitioner wanted to explain the circumstances of his prior criminal charges. (Id. at 64.) Because he was concerned about the petitioner's prior felony convictions, Attorney Butler filed a motion in limine. (Tr.

7/12/00 at 59.) According to Attorney Butler, when the court denied the motion and permitted Quiles to testify about the petitioner's criminal history, he and his client were forced to reconsider whether the petitioner should take the stand. (Tr. 7/12/00 at 59.) Attorney Butler discussed with the petitioner the advantages and disadvantages of testifying. (Tr. 7/12/00 at 59.) Attorney Butler explained that he did not think the petitioner should testify because he believed "it would impair our ability to win that appeal issue which I thought was a very good one." (Tr. 7/12/00 at 61.) In addition, Attorney Butler recognized that if the petitioner took the stand, the prosecution could inquire about the petitioner's criminal history. (Id.) In particular Attorney Butler was concerned about any inquiry by the prosecution into the petitioner's pending double homicide charge (which was a capital felony). (Id.) Attorney Butler acknowledged that he "definitely had an opinion" as to whether the petitioner should testify. He testified that the petitioner "solicited [his] opinion [and] [he] told him what [he] thought." (Tr. 7/12/00 at 60.) Attorney Butler testified that it was the petitioner's decision not to testify. (Id.)

On October 3, 2000, the habeas court issued a memorandum of decision. (Ex. C.) The state court found credible Attorney Butler's testimony that he advised the defendant not testify and that based upon this recommendation, the defendant decided not to

testify. (Memorandum of Decision at 5.) The court also found credible Attorney Butler's testimony that the defendant understood the basis of Attorney Butler's recommendation. (<u>Id.</u>) The court's decision stated in relevant part:

> Attorney Butler believed that despite [the court's] cautionary instruction, the [victim's] testimony [as to the prior convictions and pending felony charges] was more prejudicial than probative and he believed that the trial court's decisions on the motion in limine and the motion for a mistrial had an excellent chance of being overturned on appeal.
> Although Attorney Butler thought it was important that the Defendant take the witness stand to assert that the sexual acts were consensual and deny what the Victim stated, he also thought that even though he had weakened her testimony by cross-examination, it was likely that the Defendant, even if testifying, would lose at the trial level and that it would be better for him not to testify in order to preserve what Attorney Butler perceived as an excellent chance to win on appeal. He was concerned that if the Defendant testified as just indicated, his criminal record would come out on cross-examination and his appealable issue was unlikely to be successful because the Appellate Court would hold that even though it was error to admit the Victim's testimony as to the Defendant's prior and pending record, the error was harmless because the Defendant himself testified to it.
> Faced with what he considered a "Hobson's choice," Attorney Butler decided that it would be better for the Defendant not to testify and he so advised him and explained all of this reasoning to him, and the Defendant decided not to testify. Attorney Butler also expressed to the Defendant that if he testified, the details of the double homicide would be elicited and he was concerned about that. He specifically said that the Defendant said to him that he had decided not to testify based upon Attorney Butler's recommendation but that it was finally the Defendant's decision.
> The court believes Attorney Butler and in particular that the Defendant specifically decided not to testify and so advised Attorney Butler. Further, it is clear from the record . . . that Attorney Butler advised the court in the presence of the Defendant that the Defendant

12

> had decided not to testify, and there was no objection or comment by the Defendant. Attorney Butler also testified that he evaluated the Defendant as being smart and that he clearly understood the basis of Attorney Butler's recommendation. The court believes Attorney Butler's testimony in this regard. . . .
> In his cross-examination of the Victim, he was able to elicit admissions from her that she was a prostitute, that she had an extensive criminal background, that she often used an alias, that she was a drug addict and often paid off her drug suppliers by agreeing to, and then preforming, sexual acts for them and/or other individuals at their direction. The court concludes that Attorney Butler's cross-examination was well done. . . .
> Since subsequently the Appellate Court affirmed the Defendant's conviction and specifically upheld the trial court's decision to admit the evidence provided by the testimony of the Victim as to the Defendant's prior and pending record, it turned out that Attorney Butler's opinion or judgment as to the appealability of this issue was incorrect. However, the court agrees that under all the circumstances, his recommendation to the Defendant was a valid trial tactic and that his performance in this regard did not fall below the range of competence displayed by lawyers with ordinary training and skill in criminal law.

(Memorandum of Decision 4-6.) The court concluded that the petitioner failed to satisfy his burden of proving that Attorney Butler's performance was deficient and denied the petition. (<u>Id.</u> at 8.)

The petitioner appealed and the Connecticut Appellate Court affirmed the trial court's judgment denying the petition. <u>Wideman v. Commissioner of Correction</u>, 67 Conn. App. 739 (2001)(per curiam). The Connecticut Supreme Court denied the petition for certification. <u>Wideman v. Commissioner of Correction</u>, 260 Conn. 906 (2002). Having exhausted his state remedies, the petitioner initiated the present proceeding by filing a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.

III. Standard of Review

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in state custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") significantly amended § 2254. The amendments of AEDPA place "a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." Williams v. Taylor, 529 U.S. 362, 412 (2000). Pursuant to AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was adjudicated on the merits in state court only if adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

A decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case

differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002). A state court decision is an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the particular case." Id. When considering the unreasonable application clause, the focus of the inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable." Id.

IV. Discussion

The petitioner argues that he was afforded ineffective assistance of counsel because his attorney advised him not to testify. According to the petitioner, defense counsel's recommendation was unreasonable because "the only significant evidence against him was the testimony of the complaining witness and his only possible defense was his own persuasive denial." (Doc. #8, Pet.'s Mtn at 9.) Moreover, "the victim's testimony raised the question of [his] prior convictions and created some confusion in the minds of the jurors . . . ." (Id.) Under these circumstances, the petitioner argues, "[t]here was no legitimate basis for [Attorney Butler's] advice [not to testify] and the giving of it was ineffective assistance as a matter of law. In ruling otherwise, the Connecticut courts have deviated in a

15

significant way from the Sixth Amendment law clearly articulated in Strickland v. Washington, 466 U.S. 668, 687 (1984) and its progeny."  (Doc. #8, Pet.'s Mtn at 12- 13.)

A petitioner seeking to demonstrate ineffective assistance of counsel faces a "heavy burden."  Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003).  An ineffective assistance of counsel claim is reviewed under the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To prevail, the petitioner must demonstrate that (1) counsel's conduct "fell below an objective standard of reasonableness" established by prevailing professional norms and (2) this incompetence caused prejudice to him.  Id. at 687-88.  Counsel is presumed to be competent.  Id. at 689 ("a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . .").  The "burden rests on the accused to demonstrate a constitutional violation."  United States v. Cronic, 466 U.S. 648, 658 (1984).  To determine whether an attorney's conduct was deficient, "[t]he court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690.  "As a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if 'there [was] no . . . tactical justification for the course taken."  Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006)

16

(quotation marks and citations omitted); see Strickland, 466 U.S. at 689 (holding that petitioner must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy").

To satisfy the prejudice prong of the Strickland test, the petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Failure to show "either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Id. at 700. See Johnson v. Brooks, 294 F. Supp. 2d 223, 230 (D. Conn. 2003) ("Thus, if the court finds one prong of the standard lacking, it need not consider the remaining prong.")

The state habeas and Appellate Court applied the standard established in Strickland. Because the state courts applied the correct legal standard, the decisions cannot meet the "contrary to" prong of § 2254(d)(1). Therefore, the petitioner may obtain federal habeas relief only if he can show "that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner." Bell v. Cone, 535 U.S. 685, 698-99 (2002).

The state habeas court had before it the testimony of the petitioner, the petitioner's expert Attorney Farver and Attorney Butler. As noted, Attorney Farver opined that trial counsel's recommendation was a viable strategy and was within the range of

17

competence of criminal lawyers of ordinary training and skill. Attorney Butler testified as to the reasons why he did not believe the petitioner should testify, the discussions he had with the petitioner and, significantly, that it was the petitioner's decision not to take the stand. The state court clearly credited Attorney Farver and Attorney Butler's testimony. The record further indicates that the court did not believe the petitioner's testimony that Attorney Butler usurped his decision and told the court (to his surprise) that he was not going to testify. Pursuant to 28 U.S.C. § 2254(e)(1), the court's credibility determinations are presumed to be correct. Smith v. Mann, 173 F.3d 73, 76 (2d Cir. 1999). A petitioner bears the "burden of rebutting [this] presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006). He has not done so.

The issue therefore is whether the state court's conclusion that Attorney Butler's performance was not constitutionally deficient is unreasonable. It is not.

The record reflects that after Quiles testified, Attorney Butler analyzed whether the defendant should take the stand. Although the victim had testified as to what she had heard about the defendant's criminal history, Attorney Butler was concerned that the state would elicit the petitioner's prior convictions, testimony sure to eviscerate his client's credibility. In

18

Case 3:02-cv-01422-AWT    Document 19    Filed 08/11/2006    Page 19 of 20

addition, Attorney Butler's cross-examination of the victim had elicited damaging testimony including that she was a former drug user and had a criminal record. Whatever benefit there was from the defendant taking the stand to deny the allegations was outweighed, in Attorney Butler's calculus, by the benefit to be gained from preserving a promising evidentiary issue for appeal. Attorney Butler's decision to recommend to the petitioner that he not testify was strategic and therefore, as the state court found, does not form the basis for a finding of ineffective assistance. "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quotation marks omitted).

IV. Conclusion

Because the petitioner has not demonstrated that Attorney Butler's performance fell below an objective standard of reasonableness, the undersigned recommends that the petition be denied.

Any party may object to this recommended ruling within ten days after being served with the report and recommendation. "[F]ailure to timely object to a magistrate judge's report within ten (10) days will preclude appellate review." Small v. Sec'y of Health and Human Serv., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam). See 28 U.S.C. § 636(b)(1) and rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules

19

for United States Magistrates, United States District Court for the District of Connecticut.  See <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992).

Dated at Hartford, Connecticut this 11th day of August, 2006.


_____/s/_____
Donna F. Martinez
United States Magistrate Judge